IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

JAN 0 4 2008

J. T. NOBLIN, CLERK
BY_____DEPUTY

| | |
|---|---|
| KIMBERLY KAPP, individually and as mother | ) |
| | ) |
| and next friend of minor, B.K. | ) |
| | ) |
| PLAINTIFFS, | ) |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| Frank Schiavi, M.D., an individual, and; Living | ) |
| Waters Community Medical Center, PLLC, a | ) |
| Mississippi Professional Limited Liability | ) |
| Company, | ) |
| DEFENDANTS. | ) CIVIL ACTION NO: 1.09CV2H50-JMR |

**COMPLAINT**
**JURY TRIAL REQUESTED**
**STATEMENT OF JURISDICTION**

1.   Plaintiffs Kimberly Kapp (hereinafter "Ms. Kapp") and her minor son B. K.  are

citizens of the State of Arkansas.  Upon information and belief, Defendant Frank Schiavi, M.D.

(hereinafter "Dr. Schiavi") is a citizen of the State of Mississippi.  Defendant Living Waters

Community Medical Center, PLLC (hereinafter "Living Waters") is a professional limited

liability company which has its principal place of business in Pass Christian, Mississippi.  The

amount in controversy exceeds, exclusive of interests and costs, the sum specified by 28 U.S.C. §

1332.

**FACTS**

2.   Plaintiff Ms. Kapp is over the age of twenty-one (21) years and is the mother and next

friend of the minor Plaintiff B. K.  Ms. Kapp brings this action individually and on behalf of B.

K.

3.  At all material times, Defendant, Frank Schiavi, M.D., ("Dr. Schiavi"), a board certified orthopedic surgeon, was (and still is) a physician licensed to practice medicine in Mississippi and was (and still is) engaged in the practice of medicine in Mississippi.

4.  Defendant Living Waters is a professional corporation,  professional association or other legal entity.  Dr. Schiavi was acting as an agent, servant or employee of Living Waters, in the line and scope of his employment at all times pertinent to the care and treatment of B. K.

5.  Beginning November 7, 2005, at all material times, there existed a physician-patient relationship between Dr. Sciavi and B. K.

6.  On Saturday, November 5, 2005, shortly after Hurricane Katrina, B. K. presented to the emergency room at Hancock Medical Center.

7.  Infection was rampant along the Mississippi coast in November of 2005.

8.  B. K. presented to the emergency room complaining of severe pain in his left ankle. Ms. Kapp advised the medical personnel at Hancock Medical Center that B. K. had been playing in some trees the day before but that he had not suffered any known trauma.  Ms. Kapp further advised the medical personnel at Hancock Medical Center that B. K. had experienced severe pain in his ankle during the previous night.

9.  B. K. was treated by Hung T. Nguyen, M.D.("Dr. Nguyen") in the Hancock Medical Center emergency department.

10.  At the time B. K. presented to the hospital, medical personnel noted tenderness and swelling of his left ankle and noted that he was unable to walk or bear weight on his ankle.

11.  Dr. Nguyen ordered an X-Ray of B. K.'s ankle.  Dr. Nguyen reviewed the X-Ray and diagnosed a fracture of B. K.'s ankle.

12.  The x-ray ordered by Dr. Nguyen was not reviewed by a radiologist until November 7, 2005.  The radiologist found no evidence of acute fracture or dislocation and noted no significant soft tissue swelling.

13.  Dr. Nguyen ordered a complete blood count (CBC).  The CBC revealed out of range values.

14.  Dr. Nguyen diagnosed B. K. with a fractured left ankle.

15.  Dr. Nguyen and Hancock Medical Center discharged B. K. with a prescription for pain medication, a splint, and crutches.  They did not prescribe or administer any antibiotics to B. K.  They advised Ms. Kapp to have B. K. seen by an orthopedic physician within two days and provided a list of physicians which included Dr. Schiavi.

16.  On Monday, November 7, 2005, B. K. saw Dr. Schiavi.

17.  Dr. Shiavi's records from November 7  reflect that he obtained a temperature reading on B. K. and that it was 101.5 degrees.  Dr. Schiavi noted swelling of B. K.'s left calf and ankle.

18.  Ms. Kapp advised Dr. Schiavi of the diagnosis B. K. had been given and of the fact that they were not aware of any trauma.

19.  Ms. Kapp further advised Dr. Schiavi that the pain medication prescribed was not helping B. K.'s pain.

20. Dr. Schiavi reviewed an x-ray and did not see a fracture.  Dr. Schiavi ordered a bone scan which was scheduled for the following day.  Dr. Schiavi did not order any blood work.

21. Dr. Schiavi notes in his records that "the bone scan was cold."  The bone scan was transcribed at 1324 on November 8, 2005.

22. Dr. Schiavi did not see or treat B. K. on November 8, 2005.  Instead, he next saw him on November 9, 2005.

23. On November 9, 2005, Ms. Kapp called Dr. Schiavi's office to discuss the bone scan results. She advised his office that B. K.'s leg was blue.  Dr. Schiavi then saw B. K.  Dr. Schiavi noted that B. K. had been febrile and appeared dehydrated.  He noted that B. K. did not look well.  At that time, Dr. Schiavi ordered a CBC and a sed rate.

24. The CBC was elevated "with some toxic granules" and the SED rate was elevated. Finally, on November 9, 2005, after getting the results of the bloodwork, Dr. Schiavi determined that B. K. had an infection in his leg rather than a fracture and advised the Kapps to go to the hospital.

25. B. K. was admitted to pediatrics at Garden Park Hospital on November 9, 2005.  Dr. Schiavi finally aspirated B. K.'s left ankle on the night of November 9, 2005.  He obtained bloody fluid which, on examination, contained staph.

26.    Blood cultures were drawn on B. K. which revealed a methicillin resistant staph and B. K. was prescribed Clindamycin and Rocephin.

4

27.     Another physician, Dr. Bruni, was called to consult on B. K.  On November 10, 2005, Dr. Bruni believed B. K. was going into septic shock and advised that he needed to be transferred to a different hospital via helicopter.  B. K. was transported to Mobile, Alabama.

28.     B. K. underwent extensive medical care related to the infection he had suffered in his ankle and to the septicemia.  He underwent a lengthy hospital course.  Following the hospital course, he has continued to require significant medical care as a result of the infection.

## NEGLIGENCE

29.     At all material times, Defendants owed a duty of reasonable care to Plaintiff to use that knowledge, skill and care that is generally used in similar cases and circumstances, which duty these Defendants breached on one or more occasions, in one or more of the following ways, any one of which was a departure from the accepted standard of care:

A.  Defendants negligently  failed to obtain an appropriate medical history.

B.  Defendants negligently  failed to conduct an adequate physical examination of B. K.

C.  Dr. Sciavi and Living Waters negligently  failed to keep abreast of current medical and scientific tests, studies and medical literature concerning diagnosis and treatment for the medical conditions, symptoms, and problems manifested by B. K. while a patient.

D.   Defendants negligently  failed to timely and appropriately examine B. K., order diagnostic tests for B. K., or treat B. K. while a patient.

E.  Dr. Sciavi and Living Waters negligently  failed to obtain the results of the bloodwork obtained by Hancock Medical Center.

F.  Dr. Sciavi and Living Waters negligently  failed to order any bloodwork of any kind before November 9, 2005.

G.  Dr. Sciavi and Living Waters negligently  failed to include infection in the differential diagnosis related to B. K. prior to November 9, 2005.

H.  Dr. Sciavi and Living Waters negligently  failed to diagnose and/or treat the fever with which B. K. presented.

I.  Dr. Sciavi and Living Waters negligently  failed to take timely and appropriate action in light of the symptoms with which B. K. presented on November 7, 2005.

J.  Defendants negligently  failed to timely diagnose and treat the Plaintiff's staph infection in his ankle.

K.  Defendants negligently  failed to timely diagnose and treat the Plaintiff's staph infection in his bloodstream.

L.  Defendants negligently  failed to timely prescribe and/or administer antibiotics to the Plaintiff.

M.  Defendants negligently  failed to obtain timely tests of the fluid in Plaintiff's left ankle.

N.  Defendants negligently  failed to timely treat, by recommended surgical procedures, the infection in Plaintiff's ankle.

O.  Dr. Sciavi and Living Waters negligently  failed to examine and/or treat B. K. on November 8, 2005.

P.  Dr. Sciavi and Living Waters negligently failed to timely examine, diagnose and treat B. K. on November 9, 2005.

Q.  Dr. Sciavi and Living Waters negligently failed to make a referral of this patient or to timely seek adequate consultation related to the Plaintiff.

R.  Dr. Sciavi and Living Waters were otherwise negligent and careless under all of the circumstances then and there existing.

30.     As a direct and proximate result of Defendants' above described negligence, Plaintiffs suffered extensive and on-going medical care and treatment and expenses related thereto; physical pain and suffering; mental anguish; permanent scarring; permanent physical injury; future paint and suffering; future medical care.  Plaintiffs injuries include, but are not limited to: surgeries, scarring, damage to the veins and/or arteries in his leg, a filter permanently implanted in his leg, daily medication and other clotting precautions, and limitations on his activities.

31.     The Plaintiff duly filed a notice of intent to file this suit at least sixty (60) days before its filing and has attached hereto as Exhibit "A" to the lawsuit his certificate of expert consultation.

WHEREFORE PREMISES CONSIDERED, Plaintiffs pray for judgment against the Defendants in such amount as the judge and jury deem appropriate.

Respectfully submitted,

ROBERT W. SMITH

ROBERT W. SMITH (MSB 7595)

Attorney at Law

528 Jackson Avenue

Ocean Springs, MS 39564

228 818-5205

228 818-5206 FAX

OF COUNSEL:

Apsilah Owens Millsaps (pro hac vice application pending)

Owens & Millsaps, LLP

P.O. Box 2487

Tuscaloosa, AL 35403-2487

205 750-0750

205 750-0355 FAX